# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| BLUEWAVE HEALTHCARE CONSULTANTS, INC., | ) ) ) |
| PLAINTIFF, | ) |
| VS | ) CASE NO: |
| | ) |
| HEALTH DIAGNOSTIC LABORATORY, INC., | ) ) ) |
| DEFENDANT. | ) |

## COMPLAINT FOR MONETARY DAMAGES
## AND FOR AN ACCOUNTING

1. BlueWave Healthcare Consultants, Inc., is an Alabama corporation with its principal place of business being located in the state of Alabama. It is referred to hereinafter as BlueWave.

2. Health Diagnostic Laboratory, Inc. is a Virginia corporation with its principal place of business being located in the Commonwealth of Virginia. It has and presently does business, directly or through agents, servants, employees or contractors, in Alabama and within the Northeastern Division of the Northern District of Alabama. It is referred to hereinafter as HDL.

3. The amount in controversy exceeds $75,000.00 exclusive of interest, fees and costs.

4. This Court has diversity jurisdiction pursuant to 28 U.S. Code § 1332.

## *COUNT ONE*

5. BlueWave incorporates all of the above and foregoing averments and adds thereto the following:

6. On or about January 4, 2010, BlueWave entered into a Sales Agreement with HDL, a copy of which is attached hereto and incorporated herein by reference, marked as Exhibit "A". It will be referred to hereinafter as the Agreement.

7. Under the Agreement, BlueWave was to receive a percentage commission based on the revenue collected by HDL from sales made in Bluewave's designated territory, as called for in paragraph 4(a) of the Agreement.

8. The term of the Agreement was 10 years, commencing on January 4, 2010.

9. Pursuant to the terms and conditions of Exhibit "A", and as represented by HDL to BlueWave, BlueWave earned commissions from HDL, for BlueWave's sales activities, that were due and payable by December 15, 2014 in the amount of, to-wit: $3,103,512.35. HDL has failed and refused, after demand, to make the contractually called for payment.

10. Pursuant to the terms and conditions of Exhibit "A", and as represented by HDL to BlueWave, BlueWave earned commissions from HDL, for BlueWave's sales activities, that were due and payable by January 15, 2015 in the amount of, to-wit: $2,703,126.42. However, HDL has informed BlueWave that it has no intention of making such payment as and when called for.

11. Pursuant to the terms and conditions of Exhibit "A", it is believed and upon such belief averred that HDL owes BlueWave an additional amount of commissions for sales activities made in its territory, in excess of $19,000,000.00, for BlueWave's sales activities, that are due and payable. However, HDL has failed to account therefore and informed BlueWave that it has no intention of making such payment as and when called for.

12. HDL has breached its Sales Agreement with BlueWave in connection with the December 15, 2014 payment and has anticipatorily breached its sales Agreement with BlueWave in connection with the January 15, 2015 payment and other payments not yet accounted for by HDL to BlueWave.

13. In addition to the required but unpaid payments outlined above, HDL's breach has resulted in BlueWave's loss of approximately $3,000,000.00 in monthly compensation for the remaining 60 months of its contract with HDL, for a total additional future loss of $180,000,000.00.

14. HDL has wilfully, intentionally and wrongfully breached the Agreement by virtue of the above acts and practices, and by the submission of a "Sales Agreement Termination" dated January 9, 2015, in clear and direct violation of the Termination provisions contained in paragraph 7(b) of the Agreement, attached hereto and marked as Exhibit "B".

**WHEREFORE, BlueWave demands judgment against HDL in the amount of at least $204,806,638.77, interest, fees and costs.**

## COUNT TWO

15. BlueWave incorporates all of the above and foregoing averments and adds thereto the following:

16. On or about January 10, 2010, BlueWave and HDL entered into an agreement by which BlueWave was to perform certain sales activities for HDL, as from time to time it requested, initially in the states of Alabama, South Carolina, Mississippi, Tennessee, Georgia, Florida, North Carolina, Louisiana and Texas, in exchange for a percentage of the revenue paid to HDL from BlueWave's sales activities.

17. HDL accepted the full benefits of BlueWave's sales activities.

18. HDL has breached the agreement by failing to pay the called for payments to BlueWave.

**WHEREFORE, BlueWave demands judgment against HDL in the amount of at least $24,806,638.77, interest, fees and costs.**

### COUNT THREE

19. BlueWave incorporates all of the above and foregoing averments and adds thereto the following:

20. HDL owes BlueWave at least $24,806,638.77 due by open account and/or by account stated.

**WHEREFORE, BlueWave demands judgment against HDL in the amount of at least $24,806,638.77, interest, fees and costs.**

### COUNT FOUR

21. BlueWave incorporates all of the above and foregoing averments and adds thereto the following:

22. HDL owes BlueWave at least $24,806,638.77 for work and labor done for HDL by BlueWave, in part, within the State of Alabama and within the jurisdiction of this Court.

**WHEREFORE, BlueWave demands judgment against HDL in the amount of at least $24,806,638.77, interest, fees and costs.**

### COUNT FIVE

23. BlueWave incorporates all of the above and foregoing averments and adds thereto the following:

24. HDL owes BlueWave at least $24,806,638.77 for that portion of HDL's receipts from or arising out of the sales activities of BlueWave, received by HDL but not paid to BlueWave.

**WHEREFORE, BlueWave demands judgment against HDL in the amount of at least $24,806,638.77, interest, fees and costs.**

## *COUNT SIX*

25. BlueWave incorporates all of the above and foregoing averments and adds thereto the following:

26. BlueWave provided valuable services for the benefit of HDL.

27. HDL accepted the services provided.

28. HDL's retention of the compensation to which BlueWave is entitled, is unjust and inequitable.

29. BlueWave expected to be fully compensated for the work done by it as requested by HDL, at the time the services were rendered.

30. This cause of action is filed pursuant to Ga.Code Ann. Section 9-2-7.[1]

---

[1] As stated in Exhibit "A", paragraph 17, the laws of the State of Georgia are to apply to the claims asserted in this Complaint.

31. HDL owes BlueWave at least $24,806,638.77 in quantum meruit, representing the value of BlueWave's services to HDL.

**WHEREFORE, BlueWave demands judgment against HDL in the amount of at least $24,806,638.77, interest, fees and costs.**

## COUNT SEVEN

32. BlueWave incorporates all of the above and foregoing averments and adds thereto the following:

33. HDL has materially benefitted by the services provided by BlueWave.

34. HDL is not permitted to accept the valuable services of BlueWave and avoid payment for such services.

**WHEREFORE, BlueWave demands judgment against HDL in the amount of at least $24,806,638.77, interest, fees and costs.**

## COUNT EIGHT

35. BlueWave incorporates all of the above foregoing averments and adds thereto the following:

36. Under the Agreement, HDL is responsible for ascertaining and reporting to BlueWave, the amount of revenue collected by it from sales in BlueWave's

territory, and make accurate calculations of the amount of commissions to which BlueWave is entitled.

37. The records of HDL's collections are solely within the possession of HDL.

38. To date, HDL has failed to accurately report the revenue it has collected by it from sales in BlueWave's territory.

39. Because of the number and complexity of records related to the revenue collected by HDL for sales made in BlueWave's territory, and because BlueWave has been provided no access thereto, a full, accurate and complete accounting of the revenues collected by HDL for all revenue HDL has collected or received for sales made in BlueWave's territory, an accounting is required.

40. The accounting is overly complex and there is no adequate remedy at law to obtain the information required to fully and accurately ascertain the total revenue received by HDL for sales made by BlueWave in its territory.

**WHEREFORE, BlueWave demands a full, accurate and complete accounting of all revenue received or collected by HDL for sales made in BlueWave's territory, during the term of the Agreement at issue, and for such other, further or different relief to which it may be entitled including any appropriate reasonable fees and costs in the premises.**

Respectfully submitted,

/s/ John Martin Galese
John Martin Galese, ASB-5382-e61j
John@galese-ingram.com


/s/ Jeffrey L. Ingram
Jeffrey L. Ingram, ASB-9270-m74j
Jeff@galese-ingram.com

/s/ David Butler
David Butler, ASB-0350-n92b
David@galese-ingram.com

Of Counsel:

Galese & Ingram, P.C.
800 Shades Creek Parkway
Suite 300
Birmingham, Alabama 35209
(205) 870-0663
(205) 870-0681 - facsimile

## SALES AGREEMENT

This Sales Agreement (the "Agreement") is effective as of the 4TH day of January, 2010 (the "Effective Date") by and between Health Diagnostic Laboratory, Inc., a Virginia corporation, and BlueWave Healthcare Consultants, Inc., an Alabama corporation ("Contractor"). In exchange for the covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which each party acknowledges, Company and Contractor do hereby agree as follows:

1. **Appointment.** Company hereby appoints Contractor as its independent contractor to perform certain sales services for Company as requested by Company, including the sale of various laboratory tests and services of Company to physicians and medical groups specializing in cardiology and other disease management specialties (the "Services"). Contractor accepts such appointment and agrees to render the Services to Company in accordance with the terms of this Agreement. Contractor's sales territory shall be restricted to the following states: Alabama, South Carolina, Mississippi, Tennessee, Georgia, Florida, North Carolina, Louisiana and Texas (the "Territory"). This appointment shall be exclusive in that the Company will not use any other sales agents in the Territory and Contractor shall not sell any other products or services that are currently offered by the Company without the prior written approval of the Company, provided however, if Contractor fails to attain an average of at least sixty percent (60%) of the mutually agreed Sales Goals set forth in Schedule 2 hereto over any eighteen month period, unless such failure is caused by a material breach hereunder by the Company, the Company shall have the option to convert this appointment to a non-exclusive arrangement upon written notice to Contractor. Schedule 2 hereto contains the Sales Goals for 2010 and will be updated each December for the following year with mutually agreed Sales Goals for such year(s). If Contractor is meeting an average of at least ninety percent (90%) of the Sales Goals set forth in Schedule 2 hereto, Contractor shall have a right of first refusal to expand the Territory into other states in which the Company plans to do business. The Company shall give written notice to Contractor of its plan(s) to do business in another state or states prior to doing business in such states. In order to exercise its right of first refusal, Contractor must reasonably demonstrate that it can provide in a timely manner the resources needed to fulfill the plan(s) of the Company in the respective state or states. Notwithstanding the above, the Contractor's right of first refusal shall not include Pennsylvania.

2. **Duties of Contractor.** Contractor shall:

   a. Provide a sufficient number of sales personnel in the Territory who will diligently and loyally apply their skills and best efforts to performance of the Contractor's duties hereunder;

   b. perform the Services in accordance with the highest standards of skill and care in Contractor's business and sales profession;

   c. provide sales training to other agents of the Company outside the Territory as reasonably requested by the Company, but not to exceed four days per year and at the option of

1

**EXHIBIT A**

Contractor to include classroom training in Birmingham, Alabama or riding with employees of Contractor in the Territory; and

    d.    use its best efforts to maximize the Sales Goals listed on Schedule 2 hereto.

3. **Duties of Company.** Company shall:

    a.    Provide the services of registered dietitians and phlebotomists in the Territory to support Contractor's sales efforts, and where appropriate in the Company's discretion, lease space for such dietitians and phlebotomists and provide health and wellness counseling from registered dietitians via telephone and web-based portal;

    b.    provide processing and handling fees to physicians in the range of eighteen to twenty one dollars ($18.00 - $21.00) and processing and handling fees to outside labs in the range of eighteen dollars to twenty five dollars ($18.00 - $25.00), provided that, any fee change shall be mutually agreed upon by the Parties unless required by any state or federal laws or regulations;

    c.    provide clinical support training and sales and marketing materials to include, but not limited to, Physician Reference Binders, Treatment Cards and Clinical Implications Manuals;

    d.    provide Contractor with an interface to the Company's LIS software.

    e.    provide zero balance billing in the Territory for Medicare, PPOs, POSs and Medicaid, except as otherwise mutually agreed to by the Company and Contractor;

    f.    review zero balance billing in the Territory for HMOs; and

    g.    provide all materials needed to collect specimens to include, but not limited to, tubes, ice packs, shipping containers, pre-paid shipping costs, processing instructions and turn-around time for lab results, to include a complete laboratory report on all diagnostics requested by physicians and performed by the Company, not to exceed twelve (12) days.

4. **Compensation.**

    a.    Fees. Contractor shall be paid a commission equal to thirteen and eight tenths percent (13.8%) of the revenue collected by the Company from sales in the Territory for the eighteen (18) month period beginning April 1, 2010 through September 30, 2011 (the "Reduced Commission Period"). For the next eighteen (18) month period after the Reduced Commission Period, Contractor shall be paid a commission equal to nineteen and eight tenths percent (19.8%) of the revenue collected by the Company from sales in the Territory (the "Increased Commission Period"). For all other periods under this Agreement other than the Reduced Commission Period or the Increased Commission Period, Contractor shall be paid a commission equal to sixteen and eight tenths percent (16.8%) of the revenue collected by the Company from sales in the Territory. For purposes of this Agreement, a "sale" shall mean an order for services and accepted by Company obliging Company to deliver its services. Commission payments shall be paid on net amounts

received by Company for the services performed. Commission payments shall be made to Contractor on the 15th day of the month following the month in which payment for services is received by Company. In addition, during the first five years of the Agreement, Contractor shall be paid a monthly base fee equal to $53,750 in year one, $43,000 in year two, $32,250 in year three, $21,500 in year four and $10,750 in year five. Such base fee shall be paid on or before the 15th day of each month.

      b.    **Out-of-Pocket Expenses.** Contractor shall pay all of its expenses incurred in connection with Contractor's performance of Services pursuant to this Agreement, including, without limitation, hotel bills, mileage reimbursement and entertainment expenses.

      c.    **Records.** Contractor shall permit, and shall ensure that any subcontractor permits, the United States Department of Health and Human Services and General Accounting Office to review appropriate books and records relating to the performance hereunder to the extent required under Section 1861(v)(1) of the Social Security Act or any successor law or regulation.

      d.    **Stock.** In addition to the compensation in section 4(a) above, the founders of Contractor, F. Calhoun Dent, III ("Dent") and Robert Bradford Johnson ("Johnson"), shall be conveyed upon the execution of this Agreement twenty-nine and four tenths (29.4) shares each of the outstanding common stock of the Company. Dent and Johnson agree to execute the Shareholders Agreement of the Company, a copy of which is attached hereto as Exhibit A.

      e.    **Effect of Termination.** In the event Company terminates this Agreement with pursuant to section 7(b) below (a "Cause Termination"), Company shall be entitled, at its sole discretion, to withhold fees otherwise payable in whole or partial mitigation of any damage, delay, or inconvenience relating to said breach. In the event of any Cause Termination by the Company or a termination by Contractor without cause during the Reduced Commission Period, Contractor shall pay to the Company an amount equal to $1,180,000 less three percent (3%) of the revenue collected by the Company from sales generated by Contractor in the Territory during the Reduced Commission Period.

5.    **Confidential Information.**

      a.    **Definition.** In the course of performing its duties hereunder, Contractor will have access to and acquire knowledge of confidential information owned by Company, including the confidential information of others that has been entrusted to Company in confidence ("Confidential Information"). Confidential Information includes any information, of whatever nature, not generally known outside of Company and its authorized third parties, and not otherwise available to Contractor from other sources. Company will clearly identify to Contractor all information that Company considers confidential. Examples of Confidential Information include but are not limited to:

          i.    inventions, innovations of all types and research and development activities of Company;

3

ii. all non-public information developed, learned, created, or otherwise gained by Contractor in the course of performing Contractor's duties under this Agreement, which information Contractor expressly acknowledges shall be owned solely by Company; and

iii. all other materials and information concerning Company's business and its conduct that Company treats as proprietary or confidential. Confidential Information does not include any information that: (i) is or becomes generally known; (ii) is disclosed to Contractor by a third party not under an obligation of confidentiality with respect to such information; (iii) Company specifies is not confidential; (iv) was lawfully known to Contractor at the time of disclosure; or (v) is required to be publicly disclosed by law or regulation, to the extent actually so required to be disclosed.

b. **Confidentiality Obligations.** Contractor shall treat all information received from Company and clearly identified as Confidential Information as Confidential Information owned by Company. Contractor shall use Confidential Information only as reasonably necessary to perform Contractor's duties under this Agreement. During the Term (as defined in section 7 below) and at all times after any termination or expiration of this Agreement, Contractor shall not disclose such Confidential Information to any third party without Company's express prior written consent. Contractor shall take all steps practicable to preserve Confidential Information in confidence.

c. **Obligations Upon Termination.** Upon termination or expiration of this Agreement, Contractor shall deliver to Company or, at Company's sole option, destroy all Confidential Information. Contractor shall not retain any copies or derivations of any Confidential Information.

d. **Survival.** The foregoing confidentiality obligations of Contractor and any agents of Contractor shall survive the termination or expiration of this Agreement.

6. **Contractor's Covenants.**

a. **Covenant Not To Compete.** Contractor agrees if this Agreement is terminated for cause by the Company (a Cause Termination) or without cause by the Contractor, Contractor shall not without Company's express prior written consent directly or indirectly provide any similar or related services in the Territory to any actual or potential competitor of Company for a period of one (1) year after such termination, or one (1) year after entry of final judgment in any action regarding the enforceability of this provision. Contractor acknowledges and agrees that the terms of this section are reasonable and will not appreciably impair Contractor in the conduct of its business.

b. **Covenant Not To Solicit.** As used herein, "Company Client" means any organization, person, licensee or customer for whom Company or its designees, including but not limited to Contractor acting under this Agreement, has provided services, offered to provide services, or communicated with about providing services during the Term of this Agreement and in the Territory. During the Term of this Agreement, and for one (1) year thereafter if this Agreement is terminated for cause by the Company or without cause by Contractor, or one (1) year after entry of final judgment in any action regarding the enforceability of this provision, Contractor

4

shall not directly or indirectly, without the prior, express written approval of Company, solicit, accept or engage in services or business that compete with any Company line-of-business from any person or entity that is or was a Company Client.

c. Covenants. Contractor agrees that the covenants in sections 5 and 6 shall apply to both its employees and agents.

7. **Duration.**

a. Term. Unless sooner terminated, the initial term of this Agreement shall remain in effect for a period of ten (10) years from the Effective Date (the "Term"). The Term shall automatically renew for one year periods unless either party gives the other written notice of termination at least one hundred eighty (180) days prior to the end of the Term or any renewal term.

b. Termination. Either party may terminate this agreement upon the material or continuing breach by the other by giving the other thirty (30) days prior written notice of termination, specifying the breach and injury with reasonable particularity. Termination shall become effective at the end of such notice period unless the cited breach is cured to the satisfaction of the party giving notice. In addition, Company may terminate this Agreement immediately in the event that Contractor fails to meet an average of ninety percent (90%) of its Sales Goals for three consecutive years unless such failure is caused by a material breach by the Company hereunder; makes unauthorized use or disclosure of the Confidential Information; commits an act of fraud, embezzlement or theft; becomes insolvent; makes or attempts to make a general assignment for the benefit of creditors; becomes the subject of a bankruptcy or similar proceeding; or ceases to do business. The Company may terminate this Agreement in the event the Company is sold, including by merger or acquisition (a "Sales Event").

c. Sales Event. Notwithstanding anything herein to the contrary, if this Agreement is terminated (and not assumed) under a Sales Event, the Company shall pay to Contractor an amount equal to four times the commissions (not including any base fees) paid to Contractor over the twelve months immediately preceding the date of termination less the value of any consideration paid to Contractor or its principals under the Sales Event pursuant to any stock ownership in the Company (such amount defined as the "Sales Transaction Amount") with payment to be made on or before the Closing of the Sales Event. If this Agreement is assumed under the Sales Event, the Company shall escrow an amount equal to the Sales Transaction Amount for a three year period. If there is a material breach of the Agreement by the successor to the Company after the Sales Event which causes a reduction in Contractor's annual sales commissions during any of the three years after the Sales Event below the sales commissions earned in the twelve month period preceding the date of the Sales Event, Contractor shall be paid from such escrow account each year an amount equal to the difference of (i) the commissions earned by Contractor during the last twelve months prior to the Sales Event over (ii) the commissions paid to Contractor in the respective year after the Sales Event. If the material breach is such that Contractor is forced to terminate the Agreement during this three year escrow period, Contractor shall be entitled to the unamortized portion of the Sales Transaction Amount (for calculation under this provision the Sales Transaction Amount shall

5

be amortized on a monthly basis over the three year escrow period). Any amounts remaining in the escrow account after such three year period shall be returned to the Company.

Formula to Demonstrate escrow payments:

A is commission earned in 12 months prior to assumption
B is commission earned in any year of the 3 year period
C is amount paid out of escrow to Contractor

A-B=C

8. **Remedies.** Each Party acknowledges that any violation of this Agreement may subject the non-defaulting party to irreparable injury not fully compensable in monetary damages, and that such non-defaulting is entitled to seek whatever remedies are available to it at law or in equity. Each Party further consents to court enforcement of the specific language of this Agreement.

9. **Compliance With Applicable Laws.** Contractor shall observe, abide by and perform all services in compliance with the laws, rules and regulations of all jurisdictions having authority over Contractor or its work.

10. **Independent Contractor Relationship.** Contractor shall act as and be deemed to be an independent contractor for all purposes of this Agreement and shall not act, nor shall Contractor be deemed to be, an agent, employee or servant of Company. This Agreement is not intended to be one of hiring under the provisions of any workers' compensation or any other law, and shall not be so construed. Contractor has sole responsibility for making any payment for local, state, federal or international tax purposes.

11. ~~**No Assignment By Contractor.** This Agreement is personal to Contractor, and Contractor~~ may not assign (by operation of law or otherwise), subcontract, or transfer in any way any of Contractor's rights and obligations under this Agreement without the express, prior written permission of Company, provided however, Contractor may contract with independent sales agents from time to time to perform sales services within the Territory. This Agreement is freely assignable by Company to any of its successors or assigns.

12. **Indemnification.** Contractor agrees to defend, indemnify, and hold harmless Company and Company's directors, officers, and employees from and against all claims, counterclaims, defenses, losses, liabilities, and expenses (including reasonable attorneys' fees) arising from any claim that any act or omission of Contractor in connection with this Agreement or activities relating thereto caused personal injury, death, or property damage, or constituted any other legal or equitable wrong; PROVIDED, HOWEVER, that nothing herein shall be construed as making Contractor liable for any injury or damage caused solely by the negligence or wrongdoing of Company.

Company agrees to defend, indemnify, and hold harmless Contractor and Contractor's directors, officers and employees from and against all claims, counterclaims, defenses, losses, liabilities and expenses (including reasonable attorneys' fees) arising from any claim that any act or

6

omission of Company in connection with this Agreement or activities relating thereto caused personal injury, death or property damage, or constituted any other legal or equitable wrong, PROVIDED, HOWEVER, that nothing herein shall be construed as making Company liable for any injury or damage caused solely by the negligence or wrongdoing of Contractor.

13. **Severability.** The provisions of this Agreement are severable, and if any one provision is finally determined by a court of competent jurisdiction to be void, unenforceable, or contrary to law or public policy, the remainder of this Agreement will remain valid and enforceable. If any of the restrictions contained in any paragraphs of this Agreement are found to be unenforceable in whole or in part, Contractor and Company agree that the restriction or portion thereof should be enforced to the fullest extent allowed by law.

14. **Survivability.** Contractor agrees that the provisions of sections 4, 5, 6 (c), 11 and 12 of this Agreement shall survive the expiration or termination of this Agreement.

15. **Waiver.** Waiver by one party of any breach of any provision of this Agreement shall not operate or be construed as a waiver by that party of any subsequent breach.

16. **Entire Agreement.** This Agreement supersedes any prior agreements or understandings, whether oral or in writing, and constitutes the entire agreement between the parties relating to the subject matters hereof. This Agreement can be modified only in writing signed by authorized officers of both Contractor and Company.

17. **Governing Law.** Notwithstanding principles of conflicts of law of any jurisdiction to the contrary, the parties agree that all terms and provisions of this Agreement are to be construed and governed exclusively by the laws of the State of Georgia.

18. **Compliance.** This Agreement shall be construed to be in accordance with any and all federal and state laws, including laws relating to Medicare, Medicaid, and other third-party payors. In the event there is a change in such laws, whether by statute, regulation, agency or judicial decision, that has any material effect on any term of this Agreement, or in the event that counsel to one party determines that any term of this Agreement poses a risk of violating such laws, then the applicable term(s) of this Agreement shall be subject to renegotiation and either party hereto may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other party, to remedy such condition. In the interim, both Company and Contractor shall perform their obligations in full compliance with applicable law.

19. **Advice of Counsel.** Contractor acknowledges that Contractor has reviewed carefully all provisions contained in this Agreement prior to its execution. Contractor acknowledges further that Contractor has had the advice of an attorney of Contractor's choice. Contractor has executed this Agreement freely and voluntarily and believes this Agreement to be equitable, just, and reasonable.

20. **Notice.** All notices will be in writing and delivered either (i) hand delivery to the other Party; or (ii) by mailing the notice in the U.S. Mail to the last known address of the other Party,

7

certified mail, return receipt requested. Notice will be deemed to be received in case (i) on the date of actual receipt by the other Party and in case (ii) on the date of its mailing.

21. **Force Majeure.** If either Party is unable to fulfill wholly or in part any of its obligation(s) under this Agreement by reason of "Force Majeure", such Party shall forthwith give to the other Party a written notice briefly describing the circumstances causing such inability, and thereupon, to the extent that the Party giving such notice is unable to fulfill such obligation(s) by reason of such circumstances, such obligation(s) shall be suspended during, but no longer than, the continuance of such circumstances. "Force Majeure" means requisition or interference by a Government, state or local authority, war, strike, lockouts, riot or epidemic diseases, shortage of raw materials, Act of God, or any other circumstances beyond the control of the non-performing Party.

BlueWave Healthcare Consultants, Inc.                    Health Diagnostic Laboratory, Inc.

By: _____                              By: _____
Its: President                                            Its: Pres & CEO
Date: 4-2-10                                              Date: 4/2/10


The undersigned execute as to their agreement under section 4(d) above.

_____ 4/3/2010
F. Calhoun Dent, III

_____
Robert Bradford Johnson

8

## SCHEDULE 2

### Sales Goals

| 1st Qtr 2010 | 2nd Qtr 2010 | 3rd Qtr 2010 | 4th Qtr 2010 |
|---|---|---|---|
| 800 samples per week | 800 samples per week | 800 samples per week | 800 samples per week |
|  |  |  |  |

9



January 9, 2015

**VIA CERTIFIED U.S. MAIL, RETURN RECEIPT REQUESTED & EMAIL**

Mr. Brad Johnson
BlueWave Healthcare Consultants, Inc.
307 Commercial Street SE
Hanceville, AL 35077
bjohnson@bluewavehealth.com

RE: Sales Agreement Termination

Mr. Johnson:

This notice is to inform you of the termination, effective immediately, of the Sales Agreement effective January 4, 2010, by and between Health Diagnostic Laboratory, Inc. and BlueWave Healthcare Consultants, Inc. ("BlueWave").

Regards,

Joseph P. McConnell
President, CEO and Co-founder

cc:   Mr. Cal Dent

Health Diagnostic Laboratory, Inc  I  737 N. 5th Street, Suite 103  I  Richmond, VA 23219  I  1.877.4HDLABS (1.877.443.5227)

**EXHIBIT B**